**UNITED STATES of America, Plaintiff,**

v.

**WHITEHOUSE & PINE, Inc., Defendant.**

United States District Court
S. D. New York.

Aug. 11, 1958.

See, also, 127 F.Supp. 694.

Arthur H. Christy, U. S. Atty., for the S. D. of New York, New York City, for plaintiff. William Scott Ellis, Asst. U. S. Atty., New York City, of counsel.

Frederick P. Glick, New York City, for defendant. Jerome R. Halperin, New York City, of counsel.

LEVET, District Judge.

Plaintiff has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

This action is brought pursuant to Title 28 U.S.C.A. § 1345 and Section 403(c) of the Renegotiation Act, as amended (50 U.S.C.A.Appendix, § 1191).

The complaint alleges that after notice to the defendant, proceedings were had and conducted by the representative of the Navy Price Adjustment Board (Services and Sales Renegotiation Section) pursuant to the Renegotiation Act, as amended, to determine the amount of the excessive profits realized by the defendant during the fiscal year ended May 31, 1943, in the performance of contracts and subcontracts subject to renegotiation.

The complaint further states that on or about August 1, 1946, the said Navy Price Adjustment Board determined and ordered that of the profits realized by the defendant during the said fiscal year the sum of $170,000 represented excessive profits which should be eliminated and recovered; that on August 1, 1946, the said Board duly notified defendant of the determination and order and demanded payment in the sum of $170,000; that by reason thereof there is now due and owing to the plaintiff the sum of $170,-000 with interest at the rate of 6% from and after September 14, 1946.

The amended answer concedes that informal proceedings were had and conducted by representatives of the Services and Sales Renegotiation Section to determine the amount of excess profits realized by the defendant; denies that the determination and order set forth in paragraph 4 of the complaint, determining the excess profits to be $170,000, was made by the Navy Price Adjustment Board, and denies that the profits referred to therein were realized in the performance of contracts as distinguished from subcontracts subject to renegotiation. The amended answer further denies that the said sum of $170,000 is due and admits non-payment thereof.

For an affirmative defense, the defendant in this amended answer in substance alleges as follows:

(1) That subsequent to the entry of the United States in the World War in December 1941, the defendant undertook to procure and did procure for Buckeye Traction Ditcher Company (hereinafter referred to as "Buckeye") contracts with the United States in connection with Army and Navy requirements; that the defendant was to receive a commission of 1% on all shipments made by Buckeye to the United States Armed Forces on contracts procured for Buckeye by the defendant;

(2) That in December 1943 a representative of the Services and Sales Renegotiation Section, acting on behalf of the Secretary of the Navy, commenced renegotiation proceedings against the defendant for its fiscal years ending December 31, 1942 and 1943;

(3) That on August 1, 1946, a representative of said Section, acting on behalf of the Secretary of the Navy, notified the defendant that of the sums received by the defendant in the fiscal year ending May 31, 1943, the sum of $170,-000 represented express profits which should be repaid to the United States;

(4) That the said determination was based entirely upon commissions received by the defendant from Buckeye and upon a settlement sum paid by Buckeye to the defendant, and that this settlement sum was in effect based "almost entirely" on commissions due on British and Canadian contracts, but that Buck-

eye incorrectly represented to said Section that a very large part of the settlement sum should be allocated to American contracts; that the defendant endeavored to procure from said Section a record of the renegotiation proceedings against Buckeye but that all such requests of defendant for such information were denied;

(5) That defendant was a subcontractor on contracts as defined in Section 403(a)(5)(B)(ii) of the Renegotiation Act of 1943 and that the renegotiation proceedings, which are the subject matter of the within complaint, involve only commissions received by the defendant as such subcontractor;

(6) That the defendant has been aggrieved by the determination of the Secretary of the Navy within the purview of Section 403(e)(2) of the Renegotiation Act of 1943;

(7) That under such Section 403(e)(2) the defendant as a subcontractor described in Section 403(a)(5)(B)(ii) of the Renegotiation Act of 1943 has no right to file a petition with the Tax Court of the United States for redetermination thereof;

(8) That the Renegotiation Act, insofar as it is purported to subject the defendant to renegotiation and required the defendant to pay any alleged excessive profits to plaintiff, was unconstitutional, void and without lawful effect and that the said Act as amended as applied to the defendant violated the provisions of Amendment 5 of the Constitution of the United States in that it deprived the defendant of its property without due process of law, etc.

Section 403(e)(2) of the Act, 58 Stat. 87, 50 U.S.C.A. Appendix, § 1191(e)(2), which provides for appeals to the Tax Court, reads in part:

"(2) Any contractor or subcontractor (excluding a subcontractor described in subsection (a)(5)(B) [of this section] aggrieved by a determination of the Secretary made prior to the date of the enactment of the Revenue Act of 1943, with respect to a fiscal year ending before July 1, 1943 as to the existence of excessive profits, which is not embodied in an agreement with the contractor or subcontractor, may, within ninety days (not counting Sunday or a legal holiday in the District of Columbia as the last day) after the date of the enactment of the Revenue Act of 1943 [Feb. 25, 1944], file a petition with The Tax Court of the United States for a redetermination thereof, and any such contractor or subcontractor aggrieved by a determination of the Secretary made on or after the date of the enactment of the Revenue Act of 1943 [Feb. 25, 1944], with respect to any such fiscal year, as to the existence of excessive profits, which is not embodied in an agreement with the contractor or subcontractor, may, within ninety days (not counting Sunday or a legal holiday in the District of Columbia as the last day) after the date of such determination, file a petition with The Tax Court of the United States for a redetermination thereof. * * *"

Section 403(a)(5)(B) of the Act, 58 Stat. 80, 50 U.S.C.A. Appendix, § 1191(a)(5)(B), which in effect describes these "(a)(5)(B) subcontractors," reads in part:

"(5) The term 'subcontract' means— * * *

"(B) Any contract or arrangement other than a contract or arrangement between two contracting parties, one of which parties is found by the Board to be a bona fide executive officer, partner, or full-time employee of the other contracting party, (i) any amount payable under which is contingent upon the procurement of a contract or contracts with a Department or of a subcontract or subcontracts, or determined with reference to the amount of such a contract or subcontract or such contracts or subcontracts, or (ii) under which any part of the services performed or to be per-

formed consists of the soliciting, attempting to procure, or procuring a contract or contracts with a Department or a subcontract or subcontracts * * *."

It appears from an affidavit of Melvin Pine, who is a director in dissolution of Whitehouse & Pine, Inc., defendant, and who was executive vice president and secretary of the said corporation, that:

(1) During the corporate existence of the defendant, the business conducted was primarily that of acting as a commission broker and manufacturer's representative for the sale and distribution of products and machinery manufactured by its principals; that this work included solicitations and procurement of contracts for which the defendant received commissions, computed on the basis of the amount of the contracts procured for the principals. Generally, the defendant represented principals for the sale of products and machinery outside the United States;

(2) In connection with one principal, Mercer Engineering Works, Inc., hereinafter referred to as "Mercer," the defendant was to receive 5% of the net sales price of the merchandise exported. The defendant, on behalf of Mercer, entered into direct negotiations with the British Purchasing Commission and Ministry of Supply for the sale of cranes and the Procurement Division of the United States Treasury Department requested quotations and then Mercer entered into a contract with the said Department for the delivery of cranes for a total amount of $1,423,775.40. Under defendant's contract with Mercer, defendant received commissions in the total sum of $56,106.09, of which $23,838 was paid during the period renegotiated, that is, from June 1, 1942 to May 31, 1943.

(3) The defendant also had a contract with Buckeye, under which the defendant was to receive 10% of the net sales price of all merchandise sold in the territory covered but which specifically excluded the territory of the United States. In connection with this contract, the defendant negotiated sales with the British Purchasing Commission and the Canadian Purchasing Commission, for which defendant was similarly entitled to a commission of 10%;

(4) After the entry of the United States into World War II, defendant and Buckeye modified their contract, and Buckeye authorized the defendant to solicit and procure contracts with the United States Government on which 1% commissions were to be paid, payable as and when Buckeye received payment from the United States. Pursuant to this agreement, defendant procured numerous contracts for Buckeye's products with the United States Government;

(5) On December 1, 1941, Buckeye, being dissatisfied with the terms of the contract, gave six months notice of its cancellation, thus making it effective on May 31, 1942. Between the time of the notice of cancellation and the termination, negotiations for a new contract took place, but these failed and the contract terminated on May 31, 1942;

(6) As of May 31, 1942,—

(a) the total amount of contracts procured by defendant for Buckeye with the British and Canadian Purchasing Commissions totalled $14,700,000, on which there was still unshipped approximately $7,400,000;

(b) the total contracts which defendant had procured for Buckeye with the United States Government totalled approximately $22,000,000, on which there was unshipped approximately $18,500,000;

(c) the defendant had claims against Buckeye for approximately $1,200,000 commissions on the British and Canadian contracts, and approximately $192,000 commissions on the United States Government contracts.

These commissions were disputed by Buckeye, negotiations ensued, and in December 1942 a lump sum settlement was agreed upon, in which $490,000 was paid by Buckeye to the defendant. (See Exhibit F attached to the opposing papers)·

With respect to this lump sum settlement, it appears that Buckeye attempted to attribute as large a portion of the settlement proceeds as possible to commissions on the American contracts, whereas the defendant apparently was interested in attributing the settlement proceeds almost entirely to commissions on the British and Canadian contracts.

It appears from a memorandum dated January 30, 1947, addressed to John F. Sennett, Assistant Attorney General, signed by Francis Hoague, Counsel, Navy Price Adjustment Board, that the $170,000 in alleged excess profits claimed to have been received by the defendant, was arrived at as follows:

(1) The total income on commissions received by defendant in the fiscal year ending May 31, 1943 was determined to be $739,265, as follows:

| | |
|---|---|
| From Mercer | $ 26,836 |
| From Buckeye | 714,865 |
| From other principals | 1,948 |
| Total | $743,649 |
| Less amounts paid to third persons on behalf of other principals | 4,384 |
| | $739,265 (Page 5) |

(2) Of this sum, $208,205 was determined to have been received by defendant as commissions on American contracts, as follows:

| | |
|---|---|
| Actually or constructively received from Buckeye $96,708 of this sum was apparently received as a setoff) | $184,367 |
| Mercer commissions | 23,838 |
| | $208,205 (Page 9) |

(3) Twenty-eight per cent of defendant's total general operating expenses and executives' compensation was allowed, as follows:

| | |
|---|---|
| 28% of General Operating Expenses | $18,178 |
| 28% of Executives' Compensation | 3,267 |
| | $21,445 (Pages 11–12) |

(4) Defendant's "net operating profit" on American contracts was determined at $186,760, apparently by deducting $21,445 (the figure in No. 3 above) from $208,205 (the figure in No. 2 above). (Page 12)

(5) The sum of $170,000 was held to constitute excessive profits within the meaning of Section 403(a) of the Renegotiation Act.

The foregoing memorandum further states:

"Section (a)(5)(ii) of the Renegotiation Act of 1942 defines a subcontract as 'any contract or arrangement * * * (A) Any amount payable under which is contingent upon the procurement of a contract or contracts with a Department or of a subcontract or subcontracts or earned with reference to the amounts of such a contract or contracts or subcontract or subcontracts or (B) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure or procuring a contract or contracts with a Department or a subcontract or subcontracts thereunder.' Since Contractor concedes that at least part of the services to be performed under Contractor's agreement with Buckeye was in connection with the solicitation of contracts with the Departments and that the amounts payable thereunder were contingent upon amounts received under such contracts, all the income received by the Contractor under its agreement with Buckeye is subject to renego-

tiation in accordance with a literal interpretation of the Act.

"However, the SSRS [Services and Sales Renegotiation Section] has consistently interpreted Section (a) (5)(ii) so as to hold subject to renegotiation only that portion of income, received under commission arrangements, which has been earned in connection with the procurement of contracts with the Departments. Therefore, under the regular practice of the SSRS, it was determined that only $184,367, the amount referable to contracts between Buckeye and the Departments was renegotiable." (p. 14)

It appears from the foregoing that:

(1) The Renegotiation Board considered the defendant to be an (a)(5)(B) subcontractor with respect to commissions received by it on American contracts;

(2) The sum of $170,000 held to constitute excess profits was in the opinion of the Renegotiation Section derived entirely from commissions earned by defendant in procuring contracts or subcontracts with "a department" within the meaning of Section 403(a)(5)(B) of the Renegotiation Act;

(3) The defendant in effect conceded that at least a part of the services to be performed under the agreement with Buckeye were in connection with the solicitation of contracts with the departments and that as to commissions on such contracts defendant was an (a)(5)(B) subcontractor.

The defendant contends that there are a number of factual issues presented by the foregoing computations of the Services and Sales Renegotiation Section which were "raised by the defendant throughout the proceedings had before the Renegotiation authorities, on which defendant seeks an initial hearing in this court * * * as follows:

"(a) What was the amount of the lump-sum settlement received by defendant from Buckeye? During the renegotiation proceedings the authorities therein, over the objection of defendant, computed the lump-sum settlement to total $697,000. The defendant consistently and throughout the proceedings alleged the amount to be only $495,000.

"(b) Of the amount received by defendant from Buckeye in the lump-sum settlement, was $100,000 thereof, paid to a Mr. Coleman by defendant, part of defendant's earnings? * * *

"(c) Was the sum of approximately $97,000 which was *actually* received in 1941, properly attributable to the year in question as being constructively received by defendant in 1942 as commissions on United States Government contracts? * * *

"(d) What is the proper amount of expenses of defendant attributable to renegotiable profits which it received under all of its '(a) (5) (B) subcontractor'? * * *

"(e) What is the proper allocation of the lump-sum settlement received from Buckeye between United States Government contracts and British and Canadian contracts? * * *

"(f) Were the profits received by defendant from United States Government contracts under all of its '(a)(5)(B) subcontracts' 'excessive' within the statutory standards of the Renegotiation Act?" (Affidavit of Melvin Pine, pp. 15–17)

In October 1954, the plaintiff moved for summary judgment. This motion was denied by Judge Edward J. Dimock without prejudice to the renewal thereof upon a more precise definition of the facts and issues. United States v. Whitehouse & Pine, D.C.S.D.N.Y.1954, 127 F.Supp. 694.

The plaintiff in support of its present motion for summary judgment relies principally upon the fact that the defendant consistently urged before the Services and Sales Renegotiation Section (a) that little, if any, of the commissions re-

ceived from Buckeye were attributable to American contracts during the fiscal year ending May 31, 1943, all of said commissions having been on foreign contracts; and (b) that it was not subject to renegotiation during the 1942–1943 fiscal year because the amount of commissions received by it on American contracts was under the $25,000 minimum necessary for renegotiation.

The question under the circumstances here presented is: "Where may the defendant have its claims just stated reviewed?"

In my opinion, the defendant is clearly entitled to a review of the Renegotiation Section's determination by an appropriate tribunal. I do not believe that the provisions of Section 403(e)(2) of the Renegotiation Act, barring (a)(5)(B) subcontractors from an appeal to the Tax Court, was intended to deny to such subcontractors all right of review. Certainly, no express language in the statute requires such an interpretation, which would needlessly raise a serious question concerning the statute's constitutionality.

There existed no dispute as to the defendant's status as an (a)(5)(B) subcontractor insofar as its earnings represented commissions on contracts procured by it with the departments. Was the defendant, nevertheless, compelled to petition the Tax Court for a redetermination, even though a review by that court is expressly barred to an (a)(5)(B) subcontractor?

The plaintiff argues that the defendant should have sought to vindicate its position before the Tax Court and having failed to exhaust this remedy has no standing here to obtain a review of the Renegotiation Section's determination.

Plaintiff contends that the case of Whitehead v. United States, 1953, 109 F.Supp. 248, 124 Ct.Cl. 136, is here ap-

plicable. There, plaintiff sued to recover sums paid to the government as excess profits. The Renegotiation Section apparently regarded plaintiff as an "(a)(5)(b) subcontractor." However, the plaintiff flatly alleged before the Court of Claims that he did not solicit or procure government contracts. He denied that he came within the provisions of Section 403(a)(5)(B)(ii) of the Renegotiation Act or any other provision thereof. The court dismissed the petition on the ground that the plaintiff had failed to exhaust his administrative remedies by failing to take an appeal to the Tax Court, observing that:

"Plaintiff confessedly never gave the Tax Court a chance to decide whether or not it was an (a)(5)(B) subcontractor. Not until after the Tax Court had ruled on this question has any court jurisdiction of plaintiff's claim, whether or not it might have jurisdiction after the Tax Court had determined this question." 109 F.Supp. at page 250.

In the Whitehead case, supra, a dispute existed as to whether the plaintiff's activities in connection with United States Government contracts were such as came within the purview of Section 403(a)(5)(B) of the Renegotiation Act. The Court of Claims in effect held that this primary problem of coverage should have been submitted to the Tax Court.

In the case at bar, there is no dispute as to whether the defendant was an (a)(5)(B) subcontractor insofar as its activities related to the procurement of United States Government contracts. There may possibly exist a problem of coverage in the sense that if the commissions received by the defendant on United States Government contracts were less than $25,000 during the 1942–1943 fiscal year, the Renegotiation Act does not apply.[1] However, this is a problem

---

1. Renegotiation Act, Section 403(c) (6), 58 Stat. 85, 50 U.S.C.A.Appendix, § 1191 (c) (6). In the case at bar, this problem may be more apparent than real since the defendant apparently received close to $25,000 in commissions on American contracts from Mercer. Therefore, even if a small fraction of the income received by the defendant from Buckeye represented commissions on American contracts, the Renegotiation Act would be applicable.

which can only be resolved after a full-scale review of the Renegotiation Section's determination. Such a review by the Tax Court would be impractical since that tribunal is confronted at the outset with a condition fatal to its jurisdiction, namely, that if the Renegotiation Act applies at all, it admittedly applies to the defendant as an (a)(5)(B) subcontractor.

In my opinion, therefore, the Whitehead case is not controlling here.

In Moen v. United States, 1954, 121 F. Supp. 677, 128 Ct.Cl. 579, the court denied a motion to dismiss a petition challenging the correctness of a renegotiation order even though the plaintiff had failed to appeal the renegotiation order to the Tax Court. In so doing, the court stated:

"In Whitehead v. United States, supra [109 F.Supp. 248], the issue presented was whether or not the plaintiff came within the provisions of section 403(a)(5)(B) of the Renegotiation Act, defining a subcontract. The parties were in disagreement as to this. We held that this disagreement had to be resolved in the first instance by the administrative agency, and that after the administrative agency had determined it, plaintiff was under the obligation to appeal to the Tax Court to give that body an opportunity to pass on the question. For its failure to do so, we held that it had no right to resort to this court for relief.

"The question presented in this case differs from that presented in the two above discussed cases [Macauley v. Waterman Steamship Corp., 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839 and Whitehead v. United States, 109 F.Supp. 248], in that in this case there is no disagreement between the parties as to whether or not plaintiff comes within the terms of section 403(a) (5) (B). Both parties agree that he does.

"Now, section 403(e)(2) of the Renegotiation Act reads in part as follows:

"'Any contractor or subcontractor (excluding a subcontractor described in subsection (a) (5) (B)) aggrieved by a determination of the Secretary * * * may * * file a petition with The Tax Court of the United States for a redetermination thereof * * *.' 58 Stat. 78, 87.

"This section, therefore, expressly excludes plaintiff from among those who have the right to take an appeal to the Tax Court and, therefore, by implication it denies plaintiff the right to appeal to the Tax Court. It is, therefore, fallacious to say that plaintiff had not exhausted his administrative remedy for failing to take an appeal which was denied to him. Had there been a controversy between the parties over whether or not plaintiff came within the terms of the statute denying a right of appeal, this controversy should have been presented in the first instance to the Tax Court for its determination; but where there is no such controversy and where both parties agree that the plaintiff does come within the terms of the section denying him the right of appeal to the Tax Court, there is of course no necessity for such an appeal. Plaintiff was no more under an obligation to take an appeal to the Tax Court than he would have been to take an appeal to the British Parliament, or any other body that had no possible concern with the controversy." Moen v. United States, 1954, 121 F.Supp. 677, 680, 128 Ct.Cl. 579.

The defendant, under the circumstances here presented, in my opinion, was not required to petition the Tax Court for a review of the Renegotiation Section's determination in order to have exhausted his administrative remedies and is entitled in this proceeding to chal-

lenge the correctness of that determination. Since factual issues are raised by the defendant's answer which cannot be determined on this motion, the motion is denied.

So ordered.